# Applicability of the Hatch Act to the Chairman of the Native Hawaiians Study Commission

The Native Hawaiians Study Commission is an "Executive agency" whose employees are covered by the Hatch Act, even though its functions are by statute confined to advising Congress. The part-time Chairman of the Commission is covered by the Hatch Act on the days she is paid to perform government services.

June 3, 1982

## MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL, LAND AND NATURAL RESOURCES DIVISION

This responds to your request regarding the applicability of the Hatch Act to the Chairman of the Native Hawaiians Study Commission (Commission). Based on the memorandum accompanying your request, and on subsequent conversations with attorneys in the Lands Division, it is our understanding that the Chairman intends to announce her candidacy for Lieutenant Governor of Hawaii. She currently serves as a delegate to the State Legislature of Hawaii.

The Commission was established in 1980 pursuant to the Native Hawaiians Study Commission Act (NHSCA). Pub. L. No. 96–565, Title III, 94 Stat. 3321, 3324–3327 (1980), 42 U.S.C. § 2991a note (Supp. V 1981). The NHSCA directs the Commission to "conduct a study of the culture, needs, and concerns of Native Hawaiians." § 303(a). The Commission is to publish "a draft report of the findings of the Study," to distribute the draft to "appropriate" federal and state agencies, native Hawaiian organizations, and the interested public, and to solicit their written comments. § 303(c). The Commission is also directed to issue a "final report of the results of this Study" and to send copies to the President and to two congressional committees.[1] § 303(d). Finally the NHSCA directs the Commission to "make recommendations to the Congress based on its findings and conclusions [from the Study]." § 303(e). See generally Memorandum Opinion for the Chairman, Native Hawaiians Study Commission, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel (Jan. 4, 1982).*

---

[1] The two committees are the Committee on Energy and Natural Resources of the Senate and the Committee on Interior and Insular Affairs of the House of Representatives

*NOTE: The January 4, 1982, opinion ("Applicability of the Federal Advisory Committee Act and the Government in the Sunshine Act to the Native Hawaiians Study Commission") appears in this volume at p. 39, supra. Ed.

The members of the Commission were appointed by the President, who designated the Chairman and Vice Chairman. These appointments were not subject to the advice and consent of the Senate. § 302(b), (c). Commission members who are not otherwise fulltime officers or employees of the United States receive $100 for each day they are engaged in performing Commission duties. § 302(g). All Commission members also receive travel expenses. § 302(h).

Based on our review of the materials forwarded to us and the NHSCA, we conclude that the Commission Chairman is subject to the Hatch Act on the days she is compensated for Commission business. We note, however, that the Special Counsel, Office of Personnel Management, is charged with primary jurisdiction over the Hatch Act, and that more particular advice regarding application of the Hatch Act to Commission members may be obtained from that Office. We have also addressed briefly certain other statutory or regulatory provisions that may be applicable.

## I. The Hatch Act

The Hatch Act, 5 U.S.C. § 7324 (1976), provides in relevant part:

> (a) An employee in an Executive agency . . . may not—
> (1) use his official authority or influence for the purpose of interfering with or affecting the result of an election; or
> (2) take an active part in political management or in political campaigns.

Two initial questions are raised by this provision: (1) Is the Commission an "Executive agency" within the meaning of the Act; and (2) Is the Chairman a covered employee?

### A. Is the Commission an "Executive Agency"?

An "Executive agency" is defined in 5 U.S.C. § 105 (1976) as "an Executive department, a Government Corporation, or an independent establishment." The Commission is neither an executive department, see 5 U.S.C. § 101 (1976), nor a government corporation, see 5 U.S.C. § 103 (1976). However, an "independent establishment" is essentially any other organization within the Executive Branch. See 5 U.S.C. § 104 (1976).[2] Thus, if the Commission is an entity within the Executive Branch, it is an "Executive agency" within the meaning of the Hatch Act.

---

[2] 5 U S C. § 104 provides

For the purposes of this title, "independent establishment" means—
 (1) an establishment in the executive branch (other than the United States Postal Service or the Postal Rate Commission) which is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment, and
 (2) the General Accounting Office.

Whether the Commission falls within the Executive Branch or the Legislative Branch is a difficult question because of the Commission's hybrid nature. Several factors point to its being non-executive. First, the Commission was established to advise Congress rather than the President or executive agencies. *See Gannett News Service, Inc.* v. *Native Hawaiians Study Commission,* Civ. No. 82–0163, slip op. at 5 (D.D.C. June 1, 1982) (holding that the Commission is not advisory to the Executive and is therefore not subject to the Federal Advisory Committee Act); January 4, 1982 Memorandum Opinion, *supra.* Second, the Commission was initially funded from the contingent fund of the Senate, § 307(a), thus indicating its close ties with the Legislative Branch.

Our prior conclusion that the Commission was not "established" to advise the President or federal agencies pointed out that the Commission would nonetheless be subject to the Federal Advisory Committee Act (FACA) were it so utilized by the President or federal agencies. *See* January 4, 1982 Memorandum Opinion, *supra.* In other words, the Commission could become advisory to the Executive by its actions or the ways in which it was used in the Executive Branch. This possibility serves to point out that there is not always a bright line dividing the Legislative and Executive Branches, and that an advisory function to one branch does not preclude a similar function to another. Thus, while the fact that the Commission was established as advisory to Congress deserves special weight in assessing whether the Commission falls within the Executive Branch, this factor alone need not be conclusive.

Other factors, in fact, suggest that the Commission is in the Executive Branch. First, the members of the Commission are appointed solely by the President, § 302(b), who also designates the Chairman and Vice Chairman, § 302(c), and who is responsible for calling its first meeting, § 302(e). Several Commission members are fulltime employees in the Executive Branch. Second, although the Commission is advisory only to Congress because it makes recommendations only to Congress, § 303(e), its final report and written comments are submitted to the President as well as to Senate and House committees, § 303(d). Third, the Commission is now funded from appropriations for the Executive Branch out of the Unanticipated Needs Fund, which is an item in the appropriations for the Executive Office of the President. Executive Office Appropriations Act of 1980, Pub. L. No. 96–74, 93 Stat. 565 (1979). Finally, the Commission's office space is located in an executive department, the Department of the Interior, from which it receives staff support. These factors tend to support a conclusion that the Commission is established within the Executive Branch.

Not all committees in the Executive Branch are advisory in nature, as the Office of Legal Counsel has previously recognized. *See* Memorandum Opinion for the Acting Director, Executive Office of United States Attorneys, 5 Op. O.L.C. 283 (1981) (possible to construct committee that is not advisory but is rather intended to exchange information and data). Furthermore, a commission may have dual responsibilities—as in this case, advisory to Congress, fact-finding and reporting to the President—without necessarily losing its character as an executive entity.

294

On the one hand, therefore, we are faced with a body established to advise Congress, whose role in conducting a study, publishing a report, and making recommendations to Congress might be viewed as merely in aid of Congress' legislative functions. *See Buckley* v. *Valeo,* 424 U.S. 1, 139 (1976) (per curiam). On the other hand, however, the Commission's members are appointed solely by the President and include executive officers; it is funded out of and physically located in the Executive Branch; and its responsibilities include fact-finding and reporting to the President. Furthermore, the making of recommendations to Congress is not a purely legislative function, but falls squarely within the duties and powers of the Executive. *See* U.S. Const. Art. 2, cl. 3. Thus, even the mandate of the Commission to make recommendations to Congress need not be viewed as inconsistent with executive functions. Although we recognize that this is a difficult question, we conclude that the circumstances viewed as a whole point to the Commission as an entity within the Executive Branch.

## B. Are Commission Members Covered Employees?

The Hatch Act applies generally to employees in executive agencies, with certain specified exceptions. *See* 5 U.S.C. § 7324(c) & (d); Federal Personnel Manual at 733–5 ("In the absence of specific statutory exemption, the basic political activity restrictions apply to any person employed in the executive branch of the Federal Government. . . ."). The Chairman is clearly not a fulltime employee of an executive agency. Nevertheless, the Hatch Act applies to employees who work on an irregular or occasional basis on those days for which they are paid to perform government services. *See* 5 C.F.R. § 733.123(b)(4) (1981). As explained in the Federal Personnel Manual, "[p]ersons who are employed on an irregular or occasional basis, *e.g.*, experts and consultants on a per diem basis, . . . are subject to the political activity restrictions of the law while in an active duty status only and for the entire 24 hours of any day of actual employment." Federal Personnel Manual at 733–5. Employees in both the competitive service and the excepted service are subject to the restrictions of the Hatch Act. *See* 5 C.F.R. § 733.201.

There are several exceptions to Hatch Act coverage. The prohibition against taking an active part in political management or political campaigns does not apply to "an employee paid from the appropriation for the office of the President." 5 U.S.C. § 7324(d)(1). It has been suggested that this exemption would apply to Commission members for so long as the Commission is funded from the Unanticipated Needs Fund in the Executive Office of the President.

The item "Office of the President," as used in appropriation statutes when the Hatch Act was enacted, has since been replaced by the item "The White House Office" in appropriations for the Executive Office of the President. The Office of Legal Counsel has previously interpreted the "Office of the President" exemption to apply only to the White House Office. *See* 1 Op. O.L.C. 54, 56 (1977). (Application of the Hatch Act to the Vice President's staff: "the exemption to the Hatch Act in 5 U.S.C. § 7324(d)(1) was intended to apply only to persons paid

from the item for the 'White House Office,'" and not to those paid from other items in appropriations for the Executive Office of the President.) This distinction reflects the congressional intent to provide an exemption for that "inner circle of personal advisers to the President" whose government jobs are essentially "as adjuncts to the President in his role as a political officer." *Id*. at 55–56.

The current appropriation for the Executive Office of the President has 12 separate items, including items for the White House Office, the Unanticipated Needs Fund, the Office of Management and Budget, the Office of Policy Development, etc. The Unanticipated Needs Fund is independent of the White House Office item. Consistent with prior OLC precedent, therefore, we conclude that funding from the Unanticipated Needs Fund is not sufficient to satisfy the Hatch Act exemption for those paid from appropriations for the Office of the President.[3] *See also* Memorandum for the Clemency Board from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 24, 1974) (Unanticipated Personnel Needs Fund of the President does not fall within exemption).

Finally, the Hatch Act also does not apply to "the head or the assistant head of an Executive department or military department." 5 U.S.C. § 7324(d)(2). This exception is inapplicable to the Chairman, however, because the Commission is not an "Executive department." *See* 5 U.S.C. § 101. Nor is the Chairman exempt under § 7324(d)(3), which applies to persons appointed by the President, "by and with the advice and consent of the Senate." Thus, none of the arguably relevant statutory exceptions applies to the Chairman of the Commission.[4]

We therefore conclude that the Chairman of the Commission is subject to the provisions of the Hatch Act, as set forth in more detail at 5 C.F.R. § 733.122, on the days for which she is paid to perform government services. According to informal advice from the legal staff of the Office of Personnel Management (OPM), these prohibitions go to the Chairman directly, but would not prohibit billboard or other advertisements on her behalf on those days. We suggest, however, that the Chairman obtain further advice as to particular prohibitions from the Office of the Special Counsel at OPM, which has primary jurisdiction over Hatch Act matters.

## II. Other Statutory and Regulatory Provisions

There are several other statutory and regulatory provisions of which the Chairman should be aware. Pursuant to 18 U.S.C. § 602, for example, it is a crime for "a person receiving any salary or compensation for services from money derived from the Treasury of the United States to knowingly solicit any

---

[3] It might be argued that when the President uses Unanticipated Needs Funds for the White House Office itself, the Hatch Act exemption should apply nonetheless We need not address this possibility, however, because it is clear in this case that Commission members are not located in the White House Office as advisers to the President.

[4] "Persons who are retained from time to time to perform special services on a fee basis and who take no Oath of Office" also enjoy exemption from the Hatch Act *See* Federal Personnel Manual at 733–6. We have assumed that the Commission members take an oath of office, but in any event we do not believe this exception applies to a Commission Chairman appointed for a term. It is intended instead to apply to those receiving a fee, such as attorneys

296

contribution within the meaning of section 301(8) of the Federal Election Campaign Act of 1971 from any other such officer, employee, or person." 18 U.S.C. § 602(4) (Supp. V 1981).[5] Additionally, no officer or employee of the United States, or a person receiving any salary or compensation from the United States Treasury may make such a contribution to his or her employer or employing authority. 18 U.S.C. § 603 (Supp. V 1981). Presumably, this latter provision would prohibit Commission staff from making any contribution to the Chairman's campaign efforts.[6]

Finally, the Chairman should also be cognizant of the standards of conduct embodied in 3 C.F.R. § 100.735 for the Executive Office of the President, which will presumably apply for so long as Commission expenses are paid from Executive Office appropriations,[7] and those embodied in 5 C.F.R. § 735, which represent the minimum standards of conduct applicable to federal employees. Of particular concern during a campaign for state office is the following prohibition:

> (1) An employee shall avoid any action, whether or not specifically prohibited . . ., which might result in, or create the appearance of:
> (1) Using public office for private gain. . . .

3 C.F.R. § 100.735–4(c)(1); *accord* 5 C.F.R. § 735.201a(a). Copies of the standards of conduct embodied in Titles 3 and 5 of the Code of Federal Regulations are attached.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[5] "Contribution" is defined in detail at 2 U.S C § 431(e).

[6] For the purposes of the criminal conflict of interest laws, 18 U S C §§ 202–209, the Chairman is a "special Government employee," *see* 18 U.S.C § 202, to whom some, but not all, of those provisions apply. *See, e g.,* 18 U.S.C. § 208 (prohibiting personal and substantial participation in a particular matter in which employee or his or her family or organization has a financial interest)

[7] The standards of conduct found at 3 C F R § 100 735 apply not only to the White House Office, but also to other entities in the Executive Office of the President, including "any committee, board, commission, or similar group established in the Executive Office of the President " 3 C F R § 100 735–2(a).